## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 23-cr-332 (RBW)** |
| v. | : | |
| | : | |
| MATTHEW SCHMITZ, | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Matthew Schmitz to 3 months of incarceration and 12 months of supervised release. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

### I.    Introduction

Defendant Matthew Schmitz, 35, a salesman from West Islip, New York, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Schmitz pleaded guilty to Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). The government's recommendation is supported by Schmitz's (1) participation in advance planning for the riot via messaging groups with the Proud Boys, and (2) the fact that he spent at least 2 hours and 25 minutes on Capitol grounds, one hour of which was after he exited the Capitol building after being exposed to tear gas, a blatant indication that he was not allowed to be there.

The Court must also consider that Schmitz's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Schmitz's crime support a sentence of 3 months of incarceration in this case.

## II.    Factual and Procedural Background

### The January 6, 2021, Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 39, Statement of Offense.

### Defendant Schmitz's Role in the January 6, 2021, Attack on the Capitol

Since at least December of 2020, Schmitz has been a member of the Proud Boys, an organization that describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." There are local Proud Boys chapters throughout the United States. As of January 6, 2021, Schmitz was a member of his local chapter, the Long Island Proud Boys. Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group. There is

an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos and slogans to public events.

By January 2, 2021, Schmitz had joined an encrypted messaging group on Telegram[2] titled "MOSD – Op." Schmitz understood that "MOSD" stood for "Ministry of Self-Defense," and the message group was used to prepare for the event in Washington, D.C., on January 6, 2021. Specifically, members of MOSD were instructed not to wear the group's black and yellow colors on January 6, 2021, and Schmitz repeated this instruction to others within group. Other members discussed whether they could fly with their body armor and carry knives in Washington, D.C.

On January 4, 2021, Schmitz drove from Long Island to Washington, D.C. By January 5, 2021, Schmitz joined an encrypted messaging group titled "Boots on Ground" that included only those Proud Boys members who were planning to attend the event in Washington, D.C. on January 6, 2021. Members of the group were instructed to meet at the Washington Monument at 10 a.m. on January 6, 2021.

On the morning of January 6, 2021, Schmitz met a group of approximately 100 Proud Boys members near the Washington Monument at 10 a.m. As instructed, Schmitz did not wear any Proud Boys colors. He did wear a camouflage tactical helmet. At the Washington Monument, Schmitz gathered near other members of the Long Island Proud Boys as well as Proud Boys from other New York chapters.

Shortly after 10 a.m., the group of Proud Boys marched away from the rally that was taking place near the Washington Monument. One of the leaders of the march announced to the group that they were going to march to the Capitol. The group walked past the west side of the Capitol

---

[2] Telegram is a messaging application for smart devices capable of sending encrypted communications.

at approximately 11:20 a.m. Shortly before noon, the group marched to a group of food trucks located at approximately 2nd Street and Constitution Avenue NW. They arrived at approximately 12:10 p.m. and stopped and waited for approximately thirty minutes. At approximately 12:45 p.m., fifteen minutes before the certification of the Electoral College vote was scheduled to start, leaders of the march mustered the men, including Schmitz, into a column and marched them back towards the Capitol.

Schmitz and the other Proud Boys reached the Peace Circle, near the edge of the restricted portion of Capitol grounds, at approximately 12:50 p.m. Prior to their arrival, the Peace Circle was uncrowded and relatively peaceful. The First Street pedestrian entrance to the Capitol, approximately 100 feet away, was guarded by a handful of Capitol Police officers. Prominent signs posted on metal barriers at the pedestrian entrance and other locations stated, "AREA CLOSED By order of the United States Capitol Police Board."

Just minutes later, at 12:53 p.m., members of the mob violently knocked over and trampled the metal bike rack barriers, and overwhelmed the USCP officers at the pedestrian gate. Schmitz and other rioters advanced on the U.S. Capitol. Another line of USCP officers attempted to stop the crowd from pushing past more barricades towards the building, but the mob of rioters soon overwhelmed that police line as well. Schmitz and other rioters advanced onto the West Plaza, as captured in Image 1.



*Image 1: Schmitz on the West Plaza following the Peace Circle breach.*

Once on the West Plaza, Schmitz was a part of the mob that overwhelmed the police who were attempting to guard the scaffolding on the northern portion of the inauguration stage, as seen in Image 2 (circled in red). Schmitz stood directly in front of William Pepe, the president of the Hudson Valley New York Proud Boys chapter, as also seen in Image 2 (circled in yellow).



*Image 2: Schmitz (red) and Pepe (yellow) on the West Plaza by the scaffolding of the inauguration stage.*

When the mob overwhelmed the police line, Schmitz and Pepe ran inside of the scaffolding and

up the stairs which led to the Upper West Terrace of the Capitol, as seen in Image 3.



*Image 3: Schmitz (red) and Pepe (yellow) climbing up the stairs within the scaffolding.*

Schmitz and Pepe then became separated. Schmitz climbed the stairs to the Upper West

Terrace at approximately 2:11 p.m., as captured in Image 4 and Image 5.



*Image 4: Schmitz climbing up the stairs to the Upper West Terrace.*



*Image 5: Schmitz on the Upper West Terrace.*

At approximately 2:12 p.m., Dominic Pezzola, a Proud Boy from upstate New York, used a stolen police riot shield to shatter two panes of glass in a window next to the Senate Wing Door to allow rioters to enter the Capitol.

Schmitz entered via the Senate Wing Door two minutes later, at approximately 2:14:44 p.m., as captured in Image 6.



*Image 6: Schmitz entering the Capitol building via the Senate Wing Door at 2:14:44 p.m.*

Once Schmitz was inside, he turned left, walking north down a corridor for a few seconds, in the direction of the Senate Chamber, as captured in Image 7 and Image 8.



*Image 7: Schmitz walking down a corridor inside the Capitol building.*



*Image 8: Schmitz walking down a corridor inside the Capitol building.*

Approximately twelve seconds after the scene captured in Image 7, tear gas billowed down the

hallway, as captured in Image 9.



*Image 9: The same hallway captured in Image 7, now filled with tear gas.*

After the deployment of the tear gas, Schmitz turned around and walked back toward the Senate

Wing Door. He exited the Capitol building at 2:15:25 p.m. by climbing through a broken window

next to the Senate Wing Door, as captured in Image 10.



*Image 10: Schmitz climbing out of a window next to the Senate Wing Door.*

Schmitz was inside the U.S. Capitol for approximately forty-one seconds.

Immediately upon exiting, Schmitz stood outside the Senate Wing Door, wiping down his jacket with what appears to be an American flag handkerchief, as captured in Image 11.



*Image 11: Schmitz outside the Senate Wing Door after exiting through the window.*

Schmitz later joined Pezzola outside of the Senate Wing Door, as captured in Image 12.



*Image 12: Schmitz (red) and Pezzola (green) outside of the Senate Wing Door.*

At approximately 3:18 p.m., Schmitz departed the Upper West Terrace with Pepe and Pezzola, approximately one hour after Schmitz had exited the Capitol building as a result of exposure to tear gas.

Schmitz and Pezzola then walked back toward the Peace Circle to exit Capitol grounds, as captured in Image 13.



*Image 13: Schmitz (red) and Pezzola (green) near the Peace Circle, exiting Capitol grounds.*

*The Charges and Plea Agreement*

On September 25, 2023, the United States charged Schmitz by a four-count Information with violations of 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). ECF No. 11. On September 23, 2024, pursuant to a plea agreement, Schmitz pleaded guilty to Count One of the Information, charging him with violation of 18 U.S.C. § 1752(a)(1).

### III.    Statutory Penalties

Schmitz now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Schmitz faces up to twelve months of imprisonment and a fine of up to $100,000. Under the terms of that plea agreement, Schmitz agreed to pay $500 in restitution to the Architect of the Capitol. ECF No. 38 at ¶ 11. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR:

| U.S.S.G. §2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. §2B2.3(b)(1)(A)(vii) | Specific Offense Characteristic: the trespass occurred "at any restricted building or grounds." | +2 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -2 |
| Total | | 4 |

The U.S. Probation Office calculated Schmitz's criminal history as category I. PSR at ¶ 66. Accordingly, the U.S. Probation Office calculated Schmitz's total adjusted offense level, after acceptance of responsibility, at 4, and his corresponding Guidelines imprisonment range at 0 to 6 months. PSR at ¶ 106. The parties agreed to the same Guidelines calculation in the plea agreement. ECF No. 38 at 3.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a

backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of three months of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Schmitz's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Schmitz, the absence of violent or destructive acts is not a mitigating factor. Had Schmitz engaged in such conduct, he would have faced additional charges.

One of the most important factors in Schmitz's case is his coordination of criminal activity with others. By January 2, 2021, Schmitz used an encrypted messaging group on Telegram to communicate with other Proud Boys in preparation for January 6, 2021. Members of MOSD were instructed not to wear the group's black and yellow colors on January 6, and Schmitz repeated this instruction within the messaging group. On January 6, Schmitz gathered with other Proud Boys on January 6, 2021, at the rally at the Washington Monument. Rather than remaining at the rally, Schmitz went with his group to the Capitol, and after unlawfully entering the Capitol building, Schmitz reunited with other Proud Boys and remained on the restricted Capitol grounds for over

14

an hour. Schmitz's conduct is all the more concerning given that he remained on Capitol grounds even after he had been subjected to tear gas inside the building.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

### B. Schmitz's History and Characteristics

As set forth in the PSR, Schmitz was convicted in New York State in 2015 of Driving While Ability Impaired by the Consumption of Alcohol. PSR ¶ 65. In that case, Schmitz drove his vehicle onto the lawn of another person's home and crashed into something, creating noise loud enough to wake the resident at 1:35 a.m. *Id.* Schmitz fled the scene, but was apprehended by the police. *Id.* He received a sentence of a one-year conditional discharge, a 90-day license suspension, and a fine. *Id.* The crime of driving while intoxicated inherently puts innocent bystanders at risk and demonstrates Schmitz's willingness to place his interests over those of the community; likewise, his attempt to flee the scene before police could arrive demonstrates his unwillingness to take responsibility for his actions.

Schmitz has maintained steady employment since at least 2012. *Id.* at ¶¶ 89-91.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-cr-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration. First, as discussed above, Schmitz has previously been convicted for driving while intoxicated. Despite the seriousness of his conduct and his conviction, he was not deterred from subsequent criminal conduct. Second, his conduct at the Capitol also speaks to the need for specific deterrence. During the nearly two and a half hours that Schmitz was on Capitol grounds, he knew he was not authorized to be there. He saw the initial breach of the bike rack barricades by his fellow Proud Boys at the Peace Circle, he was on the stairs under the scaffolding when other rioters pushed past the police at the landing of the Upper West Terrace

16

Stairs, and seconds after entering the building, he was met by a deployment of tear gas. Nevertheless, he remained on Capitol grounds for at least one additional hour. Despite knowing that each step he was taking at the Capitol was illegal, he pressed on, further into the grounds and into the building.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[3] This Court must sentence Schmitz based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

 Schmitz has pleaded guilty to Count One of the Information, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Adam Johnson*, 21-cr-648 (RBW), the defendant pleaded guilty to 18 U.S.C. § 1752(a), and this Court sentenced him to 75 days of incarceration and 12 months of supervised release. Although Johnson destroyed evidence and the government has no evidence that Schmitz did so, there are nevertheless parallels between Johnson's and Schmitz's conduct. Johnson formed part of a mob that overwhelmed a line of police guarding the entryway to the House Chamber and crushed officers during its advance. Similarly, Schmitz was part of the mob at the Peace Circle that overwhelmed the police to gain further entry onto Capitol grounds. Both Johnson and Schmitz knew that the situation on Capitol grounds was violent, yet they both entered the building. Johnson witnessed officers use tear gas and flash bang devices to disperse the crowd, yet he persisted in breaching the Capitol through the Senate Wing Door, alongside rioters who were entering through a smashed window. Schmitz entered through that same door, exiting through a broken window only because tear gas came billowing down the hallway where he had turned.

In *United States v. Freedom Vy*, 23-cr-405 (TJK), the defendant pleaded guilty to 18 U.S.C. § 1752(a), and Judge Kelly sentenced him to 50 days of incarceration and 12 months of supervised release. Like Schmitz, Vy came to the Capitol with a group of Proud Boys members and was a member of a group chat for planning purposes for January 6. After spending over an hour on the West Front, Vy agreed to enter the Capitol Building as a unit with Zachary Rehl (another rioter who has been convicted of seditious conspiracy and other offenses) and other members of his chapter. Once inside, they celebrated their "achievement" by posing with what appears to be a rolled joint in Senator Merkley's hideaway office. In imposing sentence, Judge Kelly considered that Vy was dressed in tactical gear, that he joined a large group of people who had stalked the

Capitol, that he celebrated once entering the building, and that he entered a private area of the Capitol. The Court contrasted this conduct with Vy's level of remorse, which the Court found sincere. Here, Schmitz also wore a tactical helmet, and joined a group of rioters in making the initial breach into the Capitol ground and building, but unlike Vy, Schmitz has not expressed remorse for his conduct.

In *United States v. Jeffery Finley*, 21-cr-526 (TSC), the defendant pleaded guilty to 18 U.S.C. § 1752(a), and Judge Chutkan sentenced him to 75 days of incarceration and 12 months of supervised release. Finley was the president of a West Virginia chapter of the Proud Boys and was among the first wave of individuals to cross onto restricted grounds. He remained on restricted grounds for approximately two hours as he watched law enforcement attempt to repel the crowd using riot control techniques and pepper spray, and nevertheless entered the Capitol building. Finley deleted his social media accounts and photographs and videos of himself and others at the Capitol and by directing others to delete their photographs. In imposing sentence, Judge Chutkan considered Finley's participation as part of an organized group, as well as his tragic personal history. Schmitz likewise remained on restricted grounds for an extended period of time and lacks comparable mitigating personal circumstances.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v.*

19

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Schmitz must pay $500 in restitution, which reflects in part the role Schmitz played in the riot on January 6.[5] Plea Agreement at ¶ 11. As the plea agreement

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can

reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Schmitz's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 129.

## VII.    Fine

Schmitz's conviction for violations of 18 U.S.C. § 1752(a)(1) subject him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Schmitz's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine. *See* PSR ¶ 104.

## VIII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Schmitz to 3 months of incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Schmitz's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

---

be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Carolina Nevin*
       CAROLINA NEVIN
       Assistant United States Attorney
       601 D Street NW
       Washington, D.C. 20530
       NY Bar No. 5226121
       (202) 803-1612
       carolina.nevin@usdoj.gov